FILED

2012 Sep-17  PM 04:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **CHARLES K. OGLETREE, and** ) | |
| **STEPHANIE M. OGLETREE,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No.:  1:11-CV-489-VEH** |
| ) | |
| **BANK OF AMERICA, N.A., and** ) | |
| **BAC HOME LOANS SERVICING,** ) | |
| **LP,** ) | |
| ) | |
| **Defendants.** ) | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case arises out of a failed short sale of a mortgaged home located in Lincoln, Alabama.   (Doc. 1-1 at 5 ¶ 1). Plaintiffs Charles K. Ogletree ("Mr. Ogletree") and Stephanie M. Ogletree ("Mrs. Ogletree") (collectively, "Plaintiffs") originally filed their verified complaint in the Circuit Court of Talladega County on January 5, 2011, and asserted six separate counts.  (Doc. 1-1 at 5-24).

The lawsuit was subsequently removed to federal court by Defendants Bank of America, N.A. ("BOA"), and BAC Home Loans Servicing, LP ("BAC"), on

February 11, 2011, on the basis of diversity and federal question jurisdiction.[1] (Doc.
1). By virtue of an earlier memorandum opinion and order (Doc. 17) entered by this
court on July 20, 2011, the four claims that remain in the lawsuit are: count II for a
preliminary and permanent injunction; count III for negligent, reckless and/or wanton
servicing of loan and mortgage; count IV for negligent, reckless and/or wanton
training and/or supervision; and count VI for promissory estoppel.

Pending before the court is Defendants' Motion for Summary Judgment (Doc.
23) (the "Motion") filed on July 30, 2012. Defendants filed their materials in support
of their Motion also on that same date. (Docs. 24, 25). Plaintiffs opposed the Motion
(Doc. 26) on August 20, 2012. On September 4, 2012, Defendants followed with
their reply. (Doc. 27). Accordingly, the Motion is now under submission, and, for
the reasons explained below, is due to be granted in part and denied in part.

## II.   STANDARD

Summary judgment is proper only when there is no genuine issue of material
fact and the moving party is entitled to judgment as a matter of law. Fed. R . Civ. P.
56(c). All reasonable doubts about the facts and all justifiable inferences are resolved
in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th

---

[1]   Defendants subsequently disavowed any reliance upon federal question
jurisdiction as a basis to support their removal to federal court. (Doc. 11 at 2 n.2).

Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'"  *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## III.   BACKGROUND[2]

On October 28, 2003, Plaintiffs executed a note (the "Note") and mortgage (the "Mortgage") (collectively, the "Loan" or the "Loan Documents") secured by property located at 11705 Stemley Road, Lincoln, Alabama 35096 (the "Property").  (Doc. 1-1 ¶ 5).  A true and accurate copy of the Mortgage signed and executed by Plaintiffs on October 28, 2003, and recorded in Mortgage Book 1062, Page 493 of the records of

---

[2]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following underlying facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact.  *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

the Probate Judge of Talladega County, Alabama, is attached as Exhibit 2 to the deposition transcript of Mrs. Ogletree, Exhibit E to Defendants' Evidentiary Submission.  AF No. 1.[3]  A true and accurate copy (with the loan number redacted) of the Note signed and executed by Plaintiffs on October 28, 2003, is attached as Exhibit 1 to the deposition transcript of Mrs. Ogletree, Exhibit E to Defendants' Evidentiary Submission.  AF No. 2.

The Mortgage was assigned by Mortgage Electronic Registration Systems, Inc. ("MERS") to BAC by an Assignment of Mortgage (the "Assignment") executed on May 10, 2010, and recorded in Deed Book 947, Page 790 of the records of the Probate Judge of Talladega County, Alabama.  AF No. 3.1.  A true and exact copy of the Assignment is attached as Exhibit 30 to the deposition transcript of Mrs. Ogletree, Exhibit E to Defendants' Evidentiary Submission.  AF No. 3.2.

---

[3]  "AF" stands for admitted fact stands for and indicates a fact offered by Defendants that Plaintiffs have admitted in their written submissions on summary judgment or by virtue of any other evidence offered in support of their case. Whenever Plaintiffs have adequately disputed a fact offered by Defendants, the court has accepted their version.  The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' statement of facts as set forth in Doc. 25 at 6-10 (page references to this and other documents corresponds with the court's CM/ECF page numbering) and responded to by Plaintiffs in Doc. 26 at 2-4. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 3.2) would indicate the second sentence of paragraph 3 of Defendants' statement of facts is the subject of the court's citation to the record.

The Note explicitly provides that in the event of default "the Note Holder may require me to pay immediately the full amount of the Principal which has not been paid and all the interest that I owe on that amount." AF No. 4. The Mortgage similarly provides that in the event of default the "Lender at its option may require immediate payment in full of all sums secured by this Security Instrument . . . and may invoke the power of sale." AF No. 5.1.

Further under the Mortgage, the "Lender shall not be required to . . . modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower." AF No. 5.2. Finally, the "Note or partial interest in the Note (together with the Security Instrument) can be sold one or more times without prior notice to Borrower." AF No. 5.3.

As of January 2010, Plaintiffs were in default on their Loan. AF No. 6. Beginning in March 2010, Defendants informed Plaintiffs of their intent to accelerate pursuant to the Loan Documents. AF No. 7. In May 2010, Defendants notified Plaintiffs about the acceleration of the Note and Mortgage as well as the commencement of foreclosure proceedings. AF No. 8.

Plaintiffs admit that they received Defendants' notice of intent to accelerate and the Notice of Acceleration. AF No. 9. As stated in the May 11, 2010 Notice of Acceleration, Plaintiffs were obligated to pay $132,833.73; otherwise, a foreclosure

5

sale would take place June 16, 2010.  AF No. 10.

Between March 2010 and January 2011, Plaintiffs and Defendants discussed options to assist Plaintiffs in avoiding foreclosure. AF No. 11.1. The foreclosure was rescheduled on numerous occasions.  AF No. 11.2.

After failing to make payments when due, Plaintiffs requested that Defendants approve a short sale of the Property in the amount of $75,000.00, which was $57,833.73 less than the amount Plaintiffs owed on the Loan.  AF No. 12. Unbeknownst to Defendants at the time, the proposed short sale purchaser was Evelyn Daugherty ("Mrs. Daugherty"), Mr. Ogletree's mother.  AF No. 13.

Plaintiffs readily admit that Defendants denied their short sale request on more than one occasion. (Doc. 26 at 3 ¶ 15; *see also* Doc. 24-2 at 3-4 ¶ 16 (admitting that Plaintiffs' short sale request was denied at least three times)).  Plaintiffs further acknowledge that the Loan Documents do not contain any provisions requiring Defendants to accept a short sale proposal or to stop foreclosure proceedings to review a short sale request.  AF No. 16.

Plaintiffs indicate that they were motivated to pursue a short sale to avoid foreclosure at the suggestion of Defendants. (Doc. 26 at 3 ¶ 17). Plaintiffs admit that they did not list the Property for sale prior to seeking a short sale review.  (Doc. 24-2 at 3 ¶ 13).  As Mrs. Ogletree confirmed during her deposition, Plaintiffs' plan

regarding the proposed short sale to Mr. Ogletree's mother, was to enter into some type of side agreement with her in which Plaintiffs would return to their home to live. (Doc. 24-5 at 31 at 122-23).

However, "[a]t the time the original short sale contract was signed by Mrs. Daughtery [on or about June 3, 2010], Plaintiffs were unaware and not informed that the sale had to be an arm's length transaction and [that] Defendants would not approve a sale to Mrs. Daughtery." (Doc. 24-3 at 10 ¶ 12). Plaintiffs were not told until nearly four months after the initiation of the short sale review process that the transaction had to be an arm's length one. (Doc. 26 at 3 ¶ 17; *see also* Doc. 1 at Compl. ¶ 58 (indicating in verified complaint that Plaintiffs first became aware of arm's length requirement on or about September 7, 2010)).

Plaintiffs admit that they have suffered no out-of-pocket damages. AF No. 18. Plaintiffs filed their complaint on January 5, 2011, after Defendants declined to enter into the proposed short sale to Mr. Ogletree's mother. AF No. 19.

As of June 20, 2012, Plaintiffs continue to reside in the Property. AF No. 20.1. They have neither tendered the accelerated amount that is owed into the court nor paid Defendants directly. AF No. 20.2.

## IV.   ANALYSIS

On summary judgment, Defendants seek a dismissal of all the still pending

7

claims asserted against them.  The court addresses each one in turn.

A.    **Count III for Negligent, Reckless and/or Wanton Servicing of Loan and Mortgage**

In any negligence action, Plaintiffs must show the *prima facie* elements of duty, breach of duty, causation, and damages.  *See, e.g., Sessions v. Nonnenmann*, 842 So. 2d 649, 651 (Ala. 2002) (listing *prima facie* elements of negligence); *DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 460 (Ala. 2008) (same).

"To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty."  *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994).  Further, "[t]o be actionable, that act or omission must proximately cause the injury of which the plaintiff complains."  *Id.* (citing *Smith v. Davis*, 599 So. 2d 586 (Ala. 1992)).

The Supreme Court of Alabama has "emphasized that wantonness . . . requires on the part of the defendant some degree of consciousness that injury is likely to result from his act or omission, [and] is not to be confused with negligence."  *Kelly v. M. Trigg Enterprises, Inc.*, 605 So. 2d 1185, 1191 (Ala. 1992) (quoting *Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc.*, 510 So. 2d 142, 145 (Ala. 1987)).

As further explained in *Kelly*:

> "Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....
>
> Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act. 'Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted.' *McNeil v. Munson S.S. Lines*, 184 Ala. 420, 425, 63 So. 992 (1913)."

*Kelly*, 605 So. 2d at 1191.

In their briefing to the court, neither side has separated Plaintiffs' negligence claims from their wantonness ones; therefore, the court will not either. *See, e.g., Perry v. Hancock Fabrics, Inc.*, 541 So. 2d 521, 522 (Ala. 1989) ("There is no evidence that Hancock Fabrics breached any duty that it owed Ms. Perry (no evidence of initial legal liability); therefore, summary judgment was appropriate, for duty and breach of duty (initial legal liability) are essential elements of causes of action for negligence and wantonness."); *Martin*, 643 So. 2d at 567 ("Proximate cause is an essential element of both negligence claims and wantonness claims.").

9

### 1.    Doctrine of Negligently Undertaking A Duty

In their Motion, Defendants primarily maintain that Plaintiffs' count III fails because they cannot show that an actionable duty exists under Alabama law to support their negligence theory tied to the failed short sale of the Property.  *See, e.g., Cahaba Seafood, Inc. v. Central Bank of the South*, 567 So. 2d 1304, 1306 (Ala. 1990) (rejecting negligence and/or wantonness claim on basis that "Central Bank was under no additional obligation to help Cahaba Seafood to extricate itself from its financial difficulties").

Plaintiffs assert in opposition that while Defendants would not normally owe them any duty of care in the context of a conventional borrower/lender relationship, when Defendants volunteered to review Plaintiffs' situation for a possible short sale to avoid foreclosure, they became subject to Alabama's "undertake a duty" doctrine. Pursuant to this principle, "one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care and is liable for negligence in connection therewith."  *Smith v. Atkinson*, 771 So. 2d 429, 433 (Ala. 2000) (citing *Dailey v. City of Birmingham*, 378 So. 2d 728, 729 (Ala. 1979)); *see also Chandler v. Hospital Authority of City of Huntsville*, 548 So. 2d 1384, 1387 (Ala. 1989) ("The above-quoted admissions policies present at least a scintilla of evidence from which a jury could reasonably determine that Huntsville Hospital had assumed a duty to

provide emergency care to indigent patients in emergency situations.").[4]

While the Supreme Court of Alabama has permitted this doctrine to apply "to insurance companies and their agents[,]" *Smith*, 771 So. 2d at 433 n.3 (citing *Palomar Ins. Corp. v. Guthrie*, 583 So. 2d 1304, 1306 (Ala. 1991)), Plaintiffs have not pointed to nor has the court has been able to independently find any controlling case authority in which this principle has played a role in the relationship between a borrower and a lender and/or a mortgage servicing company in a short sale situation.

However, the undersigned has found an Alabama Supreme Court opinion which, in a case of first impression, analyzes the doctrine's application in connection with a negligent inspection claim asserted against a lender:

> We hold that no duty is imposed upon a lender of a construction loan to exercise reasonable care in its inspection of the borrower's premises, even where the borrower pays the lender's inspection fee, <u>unless the lender voluntarily undertakes to perform such inspection on behalf of and for the benefit of the borrower</u>.
>
> The mere relationship of lender/borrower, including the lender's right of inspection at the borrower's cost, does not, of itself, give rise to a duty of due care to the borrower in the lender's exercise of that right. (For the application of an analogous principle, *see Ranger Insurance*, *supra*.) But this principle does not prohibit the lender from voluntarily

---

[4] The scintilla evidence rule no longer applies in Alabama. More specifically, "Act No. 87-184, Ala. Acts 1987 (codified at Ala. Code 1975, § 12-21-12), abolished the scintilla rule [previously applicable when deciding summary judgment motions], effective June 11, 1987, and replaced it with the 'substantial evidence rule.'" *Perry*, 541 So. 2d at 522.

assuming <u>a special relationship whereby the lender undertakes to</u> <u>perform the function of inspecting the borrower's property for the</u> <u>borrower's benefit.</u>

Because the lender may exercise its independent right of inspection for its exclusive benefit, and thus incur no liability to the borrower for its negligent inspection, the burden is on the borrower, seeking to impose liability, to prove the lender's voluntary assumption of activities beyond those traditionally associated with the normal role of a money lender.

<u>This burden of proof is met only when the evidence reasonably</u> <u>supports an inference of fact to the effect that the lender, either</u> <u>affirmatively or through a course of conduct, assumed the function of</u> <u>inspection expressly, though not necessarily exclusively, for the benefit</u> <u>of the borrower.</u>  Given the element of duty, of course, the borrower must further prove its breach, either through misfeasance or malfeasance, as well as resultant damage.

*Rudolph v. First Southern Federal Sav. & Loan Ass'n*, 414 So. 2d 64, 71 (Ala. 1982)

(emphasis added).

After setting forth this framework in *Rudolph*, the Supreme Court of Alabama

reversed the summary judgment ruling in favor of the lender finding that the

evidence:

[L]en[t] itself to a reasonable inference that Mr. Rains's [*i.e.*, the agent of the lender] statements were intended as assurances to the Rudolphs [*i.e.*, the borrowers] that First Southern's inspection service, by which the revised draw schedule would be controlled, was a viable substitute for the architect's approval safeguards contained in the former contract, and that the new inspection safeguards were intended to inure to the benefit of the Rudolphs.

12

*Id.* at 72.

Additionally, in *First Federal Sav. & Loan Ass'n of Hamilton v. Caudle*, 425 So. 2d 1050 (Ala. 1982), the Supreme Court of Alabama upheld a jury verdict in favor of prospective home buyers who had asserted negligence under an assumption of duty theory regarding their efforts to obtain a federally subsidized loan:

> First Federal's argument that the verdict cannot be sustained because it was under no duty to service a 235 loan is also without merit. <u>Although First Federal was under no duty to help procure a federally subsidized loan for the Caudles, once it voluntarily agreed to assist the Caudles, it was required to act with due care.</u> *McGaha v. Steadman*, 410 So.2d 420, 421 (Ala. Civ. App. 1981); *Dailey v. City of Birmingham*, 378 So. 2d 728, 729 (Ala. 1979). <u>The jury could have found from the testimony of Mrs. Caudle and the contractor that First Federal's employee told both Mrs. Caudle and the contractor that the FHA 235 loan had been approved and that construction of the Caudle home could commence</u>; and the jury could have further found that it was clear or should have been clear to First Federal's employee, at that time, that the commitment received from HUD was merely "conditional" and not final. We recognize that First Federal's employee testified that she told both the contractor and Mrs. Caudle that the commitment was only conditional; however, that conflict in the testimony was resolved by the jury in the Caudles' favor.

*Id.* at 1052 (emphasis added); *see also Williamson v. Realty Champion*, 551 So. 2d 1000, 1002 (Ala. 1989) (citation omitted) ("First Union was under no duty to aid the Williamsons in obtaining an F.H.A. loan.  However, once First Union agreed to help them procure the loan, it assumed a duty to act with due care.").

Thus, contrary to Defendants' stance, Alabama law does recognize certain

circumstances under which a duty to undertake with due care can attach to a lender's voluntary actions that "create[s] a 'special relationship'" with respect to a borrower, *Williamson*, 551 So. 2d at 1002, that is "independent of their contractual obligations." (Doc. 27 at 8). Defendants, even in their reply, have not acknowledged, much less addressed, any of the foregoing Supreme Court of Alabama opinions that embrace this doctrine's application to lenders; instead, they repeatedly rely upon several non-binding, off-point federal district court decisions that involve claims of negligent loan servicing. (Doc. 25 at 17-18 (citing *Jackson v. Countrywide Home Loans*, 2012 U.S. Dist. LEXIS 29994 (M.D. Ala. Mar. 7, 2012); *Blake v. Bank of America, N.A.*, 3:11-CV-242-MEF (M.D. Ala. Feb. 27, 2012); Doc. 27 at 7-8 (same)).

Plaintiffs' cause of action for negligence as articulated in their opposition is unrelated to loan servicing. Moreover, Defendants' lack of legal development material to the merits of Plaintiffs' negligence claim tied to Defendants' assumption of a duty fails to meet their burden as the movants.

Therefore, guided by *Rudolph*, *Caudle*, and *Williamson*, the court concludes that by virtue of Defendants' voluntary offer to assist Plaintiffs with the short sale process, Plaintiffs' negligent undertaking claim is potentially viable under Alabama law. Accordingly, that portion of the Motion is due to be denied.

### 2.    Lack of Actionable Wrongdoing and Proximately Caused  Damages

Having determined that Alabama law does not preclude Plaintiffs from pursuing a negligence claim premised upon Defendants' duty to assist Plaintiffs with due care in their efforts to procure a short sale, the court now reviews the record to determine whether there is sufficient evidence contained in the record to support the other elements of Plaintiffs' short sale negligence claim.  Defendants maintain that even if they "somehow owed Plaintiffs a duty of care, there is nothing in the record to indicate wrongdoing by Defendants related to Plaintiffs' proposed short sale attempts other than Plaintiffs' speculation and conjecture."  (Doc. 27 at 8).

Contrasting the facts of this case with those at issue in *Caudle*, the court agrees with Defendants and finds that the record lacks evidentiary support from which a reasonable jury could conclude that Defendants' actions were wrongful, unreasonable, or that they breached the duty of care owed to Plaintiffs.  In particular, unlike *Caudle,* which involved a false statement made by the lender's representative about the status of the federally subsidized loan, here, it is undisputed that no agent of Defendants ever told Plaintiffs that the proposed short sale to Mr. Olgetree's mother was a permissible transaction or that it had been formally approved.  (*See, e.g.*, Doc. 24-2 at 4 (Plaintiffs' admitting that "neither Defendant nor said

representatives ever admitted that the short sale was officially accepted")).

Instead, the record shows that, consistent with the duty which they undertook, Defendants reviewed Plaintiffs' request for the approval of the short sale of the Property in the amount of $75,000.00, which was $57,833.73 less than the amount Plaintiffs owed on the Loan.  However, Defendants ultimately rejected this proposed transaction when they learned that the intended purchaser was Mr. Ogletree's mother as opposed to an arms-length buyer, as required by the terms governing Defendants' short sale program.  (*See, e.g.*, Doc. 24-5 at 198 ("**AFFIDAVIT OF 'ARM'S LENGTH TRANSACTION**'"); *id.* at 202 ("Additional documentation may be required as a stipulation of investor approval (for example . . . arms' length affidavit.")).

Additionally, while Plaintiffs complain about the length of time that it took, *i.e.*, nearly four months, before they were informed about the arm's length negotiation requirement, they have not linked this delay (assuming that such a passage in time falls below the standard of care) to their non-calculable damages, *i.e.*, an inability to avoid foreclosure, proximately caused by Defendants' conduct.  Under Alabama law, "[p]roximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred."  *Thetford v. City of Clanton*, 605 So. 2d 835, 840

16

(Ala. 1992) (emphasis added); *see also Martin*, 643 So. 2d at 567 ("An injury may proximately result from concurring causes; however, it is still necessary that the plaintiff prove that the defendant's negligence caused the injury.") (emphasis added).

When Plaintiffs decided to pursue the short sale option with Defendants, they were already in default, and Defendants had already begun the foreclosure process on the Property.  Further, Plaintiffs have confirmed that their motivation for exploring this alternative with Defendants was to avoid foreclosure.  (Doc. 26 at 3 ¶ 17). Therefore, because prior to even considering the short sale scenario, Plaintiffs' ability to avoid a foreclosure was admittedly already in jeopardy, they cannot proximately connect their claimed injury of losing their house to any undue delay and confusion caused by Defendants during the short sale period of review and consideration.  *Cf. Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d 1269, 1287 (M.D. Ala. 1999) ("There are no damages flowing from FMCC's alleged negligent investigation. Whatever damages flow from their lack of investigation relate to the ratification of Auburn Ford's fraud not to any negligence claim.").

This undisputed evidence relating to the reality of imminent foreclosure also means that Plaintiffs are unable to fairly trace their mental anguish damages, such as any stress and embarrassment stemming from the uncertainty over whether they would be able to keep their home, to Defendants' actions during the short sale

process–Plaintiffs' apprehension and mental distress about losing their residence preexisted any of their short sale dealings with Defendants.

Finally, Plaintiffs concede that they have not suffered any out-of-pocket damages due to Defendants' actions. Therefore, while Plaintiffs' negligent short sale claim survives Defendants' duty challenge, it still prima facially fails on the elements of breach of duty and proximate causation of damages as explained above. Accordingly, the Motion is due to be granted as to those particular parts, and count III of Plaintiffs' complaint is due to be dismissed.

### B.   Count IV for Negligent, Reckless and/or Wanton Training and/or Supervision

Count IV of Plaintiffs' complaint is premised upon the alleged negligent conduct of Defendants' employees or agents analyzed above in section IV.A. of this opinion. Defendants contend that in the absence of an actionable underlying tort attributable to an agent, Plaintiffs cannot prevail on count IV of their complaint. (Doc. 27 at 9).

Under Alabama law, "a party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agents." *University Federal Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003) (citing *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1071, 1073 (Ala. 2003)); *see Jones Exp., Inc. v.*

*Jackson*, 86 So.3d 298, 305 (Ala. 2010) ("As *Stevenson* and *Big B* demonstrate, and as the additional authorities cited above indicate generally, implicit in the tort of negligent hiring, retention, training, and supervision is the concept that, as a consequence of the employee's incompetence, the employee committed some sort of act, wrongdoing, or tort that caused the plaintiff's injury." (citing *Humana Med. Corp. of Alabama v. Traffanstedt*, 597 So. 2d 667, 669 (Ala.1992))); *see also Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) ("Once the magistrate judge dismissed the federal sexual harassment charge, Chambless was required to establish some other underlying tort in order to prevail in her state law claims for negligent training, supervision, and retention." (citing *Grayson*, 878 So. 2d at 291)).

Thus, when a court concludes that the underlying purportedly wrongful conduct committed by the agent does not survive summary judgment, then the related negligent training and supervision claim is also subject to dismissal. *See Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008) ("Because we hold that the Jays' claims alleging wrongful conduct on the part of any employees or officers of Peoples Bank or Alabama Catfish were properly dismissed on summary judgment, their negligent-and/or wanton-supervision claim is without merit."); *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 825 (Ala. 1999)

("Accordingly, a verdict against Pemco based on a finding of negligent training and supervision would be inconsistent with a verdict exonerating Windsor."); *see also Chambless*, 481 F.3d at 1350 ("Chambless thus failed to prove an underlying state or federal tort[,] and [t]he magistrate judge properly dismissed the state law claims.").

Therefore, akin to *Flying J* and *Stevenson*, because Plaintiffs' underlying negligent short sale claim does not survive summary judgment, their negligent, reckless and/or wanton training and/or supervision count premised upon that same conduct must also fail.  According, the Motion is due to be granted with respect to count III of Plaintiffs' complaint.

### C.   Count VI for Promissory Estoppel

Promissory estoppel is an equitable theory of recovery relating to contractual liability under Alabama law. *See Aldridge v. DaimlerChrysler Corp.*, 809 So. 2d 785, 794 (Ala. 2001) ("When one seeks to impose liability under the doctrine of promissory estoppel, we look to the facts to determine whether that doctrine can be used to create liability, once we have determined that no binding contract existed."); *see also Wyatt v. BellSouth, Inc.*, 757 So.2d 403, 408 (Ala. 2000) ("The doctrine of promissory estoppel should not be used as a basis for awarding damages that would not, under general principles of contract law, be recoverable in an action for breach of contract."); *id.* ("Otherwise, the plaintiff in an action founded on promissory

20

estoppel would be in a better position than if he had been entitled to recover in an action on a contract."); *Ford v. Jackson Square, Ltd.*, 548 So. 2d 1007, 1012 (Ala. 1989) ("[T]he purpose of equitable and promissory estoppel 'is to promote equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience.'" (quoting *Mazer v. Jackson Ins. Agency*, 340 So.2d 770, 772 (Ala. 1976))).

In order to prevail on a promissory estoppel claim, Plaintiffs must prove that:

> "The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies upon that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct."

*Penick v. Most Worshipful Prince Hall Grand Lodge F & A M of Alabama, Inc.*, 46 So. 3d 416, 431 (Ala. 2010) (internal quotation marks omitted) (quoting *Mazer v. Jackson Ins. Agency*, 340 So. 2d 770, 773 (Ala. 1976)).  In their Motion, Defendants maintain that Plaintiffs' promissory estoppel claim fails because they have no evidence from which a reasonable jury could conclude that Defendants misled them in any manner that could equitably create contractual liability.  (Doc. 25 at 12).

Consistent with the analysis surrounding Plaintiffs' negligent short sale claim in section IV.A. above, Plaintiffs have not established that Defendants ever once

assured them that the inchoate short sale of the Property would go through, much less that Defendants misleadingly made such a promise with the knowledge that the suggested sale involved an unacceptable, non-arm's length purchaser, *i.e.*, Mr. Ogletree's mother.  Instead, the record confirms that Defendants were unaware of Mr. Ogletree's mother's involvement as a potential buyer at the outset of the short sale dealings, and regardless, that Defendants never indicated to Plaintiffs (either orally or in writing) that the short sale was or would ever be approved.

Additionally, Plaintiffs cannot use promissory estoppel to equitably impose liability on Defendants for any alleged misconduct that is non-contractual in nature like causing undue delay or confusion during the short sale process.  *See Aldridge*, 809 So. 2d at 794 (rejecting promissory estoppel claim relating to "a general promise of preferential rehire rights or of consideration for future employment" because such theory "cannot be used to create liability against a party under circumstances that would not sustain a contract if one had been made"); *see also Bates v. Jim Walter Resources, Inc.*, 418 So. 2d 903, 905 (Ala. 1982) ("[P]romissory or equitable estoppel cannot be utilized to create primary contractual liability where none would otherwise exist.").  Accordingly, the promissory estoppel portion of Defendants' Motion is due to be granted.

### D.    Count II for Preliminary and Permanent Injunction

As for count II, Defendants contend that Plaintiffs cannot show that they are likely to succeed on the merits of their claims, an essential injunctive element, because none of their remaining claims survives summary judgment.  (Doc. 25 at 21; Doc. 27 at 12).  Plaintiffs do not dispute that obtaining traditional injunctive relief[5] requires them to "clearly establish[]: (1) a substantial likelihood that [t]he[y] will ultimately prevail on the merits; . . . ."  *Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir. 1987) (citing *Johnson v. U.S. Department of Agriculture*, 734 F.2d 774, 781 (11th Cir. 1984)).

Further, in the absence of any viable claims, this first prerequisite to obtaining preliminary and permanent injunctive relief cannot be met.  *See e.g., Paisey v. Vitale In and For Broward County*, 807 F.2d 889, 892 (11th Cir. 1986) ("[T]he district court did not err in denying Paisey's motion for a preliminary injunction and dismissing the injunctive count of Paisey's complaint because Paisey has failed to state a claim for relief cognizable under Section 1983."); *Klay*, 376 F.3d at 1097 n.5 ("[A] party may

---

[5]    "There are at least three different types of injunctions a federal court may issue."  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004).  "The first[, which matters here,] is a 'traditional' injunction, which may be issued as either an interim or permanent remedy for certain breaches of common law, statutory, or constitutional rights."  *Id.* (footnote omitted).

not obtain a 'traditional' injunction if he lacks a cognizable, meritorious claim."); *Klay*, 376 at 1098 ("Considering the issue from another perspective, a traditional injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise."). Therefore, the injunctive and final part of Defendants' Motion is due to be granted.

## IV.   Conclusion

Accordingly, for the reasons explained above, the Motion is due to be granted in part and denied in part. Further, with no pending claims remaining, Plaintiffs' lawsuit is due to be dismissed with prejudice. The court will enter a separate order.

**DONE** and **ORDERED** this the 17th day of September, 2012.

**VIRGINIA EMERSON HOPKINS**
United States District Judge